Good morning. I'm privileged to represent Brother Records, and Brian Wilson. My name is David Parker. I think this is a case that presents an opportunity for the circuit to further refine the issue of latchies and, in particular, prospective injunctive relief in intellectual property and similar kinds of cases. The two leading cases in this circuit, the so-called James Bond case, John Jock, LLC versus Sony, and an opinion written by Judge O'Scanlan in Gerald Formula's case, figure prominently in the comments that I want to make today. I'm rather disappointed you didn't include on your list of leading cases Grand Canyon Trust versus Tucson Electric Power, which would have helped. It was too big. It was just too big a case. Sorry. The elements of latchies are well known. We realize that there has to be full knowledge of the facts for a long period of time. And I wanted to talk a little bit about the two-step analysis in Gerald Formula's. Judge O'Scanlan sets out these two steps that you assess. You set the timeline. You start with the wrongful acts. You pin the point in time when litigation is commenced. And then you analyze along that time frame at what point is there full knowledge of the facts. And then you pin the next point. When does it become so unreasonable that the party who has agreed should be taking action and has not done that? And I would add a refinement that has to do with the element of prejudice, which is when we assess what is relevant in terms of prejudice, we begin at the point in the timeline where the delay has become unreasonable. In other words, during the period of wrongdoing, the agreed party has no notion of what's going on. Whatever is being done that could otherwise be cited as prejudice is irrelevant because they're operating under the radar screen. And even in that period of time between discovering the full facts and the reasonable period of time that one is allowed to assess whether it makes sense to embark on expensive litigation, during that period of time, any claim of prejudice is irrelevant. You focus on the point when it becomes unreasonable. What we have here, very obviously an unusual set of facts, but what we have here is in 1962, as the district court found, you have a disaffirmance letter followed by a ruling in the L.A. Superior Court that puts Morgan on notice. And according to the district court, he recognizes and accepts that he has received nothing. There is no license. The letter from the father was not legally effective. And then, of course, adding the fact that the band members were all minors at the time. And then you have a 12-year drought followed by a smattering of small checks, almost all of which are publishing. They have nothing to do with sound recordings. Followed by another 12-year drought. When I say a drought, I mean there is no evidence in the record from the death of Hyte Morgan in 1974, excuse me, from 1962 to 1974. In other words, the disaffirmance, 12 years go by and then Hyte Morgan passes away. And during that period of time, there are no royalty checks. There's nothing in the record to show that there's any awareness that there's been a wrongful exploitation of the intellectual property. And then you have a smattering of checks, almost all to one band member. Almost all of them are for publishing. In other words, songwriting, which has nothing to do with the recordings themselves. And then 12 more years, from 1979 to 1991, where we have another drought. Same as I defined earlier. There are no checks. There's nothing in the record to show an awareness. And then you get to the 1990s. And what do you have? You have litigation. And when is it that the Beach Boys are aware of these two items of litigation that they're identifying? The question is whether they have noticed that these recordings are being sold. Correct? By the Morgans, yes. Right. And these are being sold in the open market. The question is, what is there in the record that shows an awareness that there is substantial selling? I asked you a question. Are these being sold in the open market? Yes. That is to say, if you had gone down to the record store and you could have maybe bought one? Well, not necessarily from one that has been licensed by the Morgans, no. I mean, are they out there? Yes, but you've got to remember, they record through Capitol Records. And so there are Beach Boy recordings everywhere you go. If I understand Judge Fletcher's question, is how could I go and buy one of these? Where would I have to go? Well, in 1991, you could have gone to Chevrolet, apparently. They had some kind of – what they would do is they would create compilations, for example. And some of the songs would be on a compilation. They'd be used for promotions like the Chevrolet promotion. Well, then they're not on the open market as such. Well, I didn't want to pull over the word open market. I'm not certain. It depends on how you define that. I don't consider that necessarily the open market. But if you go down to a record store, you're not going to find necessarily recordings that stem from the people who have been licensed by the Morgans improperly. You say not necessarily? That word necessarily worries me. You might or you might not? Well, we have to deal with a record that was before the trial court. And there is nothing in the record. There is absolutely nothing in the record. You get to 1998, and you have the president of the company, Elliot Lott, testifying. What does he testify to? He was aware of a claim that they owned the masters. No dispute about that. They did own the masters from those original recordings, the deck recordings. That doesn't mean they have the right to explain. Your time is running on you, and so far you've been discussing notice. I'd like to move on to the second prong, because in order to find latches against your client, you've got to find both notice and prejudice. Let me ask you about prejudice. You've stated that they've ‑‑ you've addressed their claim that they've expended $450,000 in attorney's fees, and you've made a point, which seems to me perfectly sensible, that you'd like to know a little bit more about these. Were the fees recovered and so on? There's another question I have, and it may or may not be in the record at this point, but I think it is not, and that is how much money did they make during this period? Because we're talking about prejudice. We're talking about prejudice. That is to say, if by your client's delay they're allowed to make an enormous amount of money, that doesn't sound like prejudice. Well, the irony here is we have no evidence of expense, and we have no evidence of revenue, and therefore we have nothing on profit. We don't have any evidence of checks being written for anything other than lawyers. Where's the advertising? Where's the distribution? Where's the P&L? I mean, if this is a business, and we're told that it is, where's the P&L? Because is there a reason why they didn't want to present evidence on profitability? Because if they have earned back on their investment, where is the prejudice? It's not like Jarrow Formulas where you're selling a product, and you invest in creating an identity in the market where if you had known there was a dispute, you could have gone another way, and now you're out there and there's nothing you can do. It isn't like that, because the identity they're selling is my client's. It's not theirs to sell to begin with. And so they have the burden of proof. They're the ones asserting laches. There's nothing in this record. And then when you turn to beyond prejudice, to the issue of prospective relief, it takes on even greater urgency. We have two cases, I've mentioned them both, where prospective relief is denied. I mean, it's one thing to give them a free pass for what they've done in the past, but to give them a perpetual license, free of royalties, to exploit forever. Well, those two cases, Jarrow Formulas and the James Bond case, are completely different cases. In James Bond, the prejudice that was found that created the laches defense and barred the damage relief, was so, the inherent nature of it is, it will always be a problem. Those people are dead. Those documents are gone. Nothing can ever change that. Jarrow Formulas is different because it's economic harm. There are, of course, two kinds of prejudice, economic and litigation, the loss of evidence and so forth. And so in Jarrow Formulas, they have gone so far out for seven years investing millions of dollars to create this identity, and now they will be prejudiced if they have to go back to square one. And so prospective relief is denied. How could it be denied here? There is indeed, the judge took no evidence on whether they had gotten a return on their investment. He didn't know what their investment was because there wasn't any evidence of that either. So I believe that this Court should find that at a minimum, apart from whether or not laches could be made to apply as to the past, that a permanent injunction lies. And even if there's some question about it, it should be remanded so there can be some evidence, and we can find out, did they invest? It doesn't look like it. It looks like they licensed other people who did the heavy lifting, and then they received money. How much money? We have no idea because the party with the burden of proof never presented any. If I could reserve or answer questions. Thank you. We'll hear from the other side. Thank you. Thank you, Court Allen Hyman, for Bruce Morgan, who's here, by the way. You're — this Court, of course, is the third. We've had three judges, Macklin Fleming, Judge Harry Hupt, now deceased, and Judge Consuelo Marshall look at this. And it's your turn. To me, I respectfully suggest to the Court, the evidence of laches is — is overwhelming. And I disagree, respectfully disagree with counsel, learned counsel. He says full knowledge. The cases are not full knowledge. The cases are, as Judge O'Scallion wrote, known or should have known. Known or should have known. That Mike Love puts in a declaration that he was so busy receiving so many checks that he didn't pay any attention at all to his business manager. It's — that's from Jarrow. Known or should have known. And when you have — should not have alerted him to the fact of what he's now complaining about. Yes. They look like publishing royalties. Ah, but the checks say to what record companies. ERA, United Artists. These are publishing royalties for the use of the masters with these record companies. And in fact, in 1991, 92, they list all the record companies that are paying for Serfin, the master Serfin, the publishing element of Serfin. And remarkably, remarkably, remarkably — and I'll put this one out there for you. Remarkably, it is the — it is the 19 — in 1962, after the Beach Boys signed with Capitol Records, Heit Morgan, on October 1, 1962, writes to Capitol Records, We're pleased to make you a grant, gratuitous grant, covering our master, Serfin, for a period of three years, Heit Morgan Deck Records. The Beach Boys are recording for Deck Records. They don't rerecord Serfin. And on their very album, which is going out, that they have their recordings on, is the Deck Record license of Serfin on the very Beach Boy album that's being sold, being licensed from Deck in 1961. Let me ask you about — And not only that, the Beach Boys were the third-party defendants in a lawsuit in 1965 brought by Heit Morgan concerning the masters against Capitol, who then sued the Beach Boys for indemnity, and their parties to that lawsuit in 1965, where he asserts he's the owner of the masters. Let me ask you about prejudice. How much money did your client make during this period off of these disputed recordings? What period is that, Your Honor? You can tell me whatever period you want. There's a long period here. I think it's difficult. And we were asked, and that's difficult. I would say the masters, because of the dispute and claims, I would go back and say from the 1991 up to this lawsuit, 2000, because then they stopped licensing very, very much. In the 91 to 2000, maybe about $30,000, $40,000 a year, probably. And this is in the record? No, it's not. I was going outside of the record. I was just trying to be forthright. I was trying to be forthright. But without having that in the record, I have trouble figuring out how the district judge could, as a matter of summary judgment, have concluded that there either was or was not prejudice. I'll now read to you from my favorite case that neither of you seem to have cited. The issue in that case was whether there was latches and not challenging the operation of a power plant without a permit. And finally, the plaintiffs come forward and say, you know, you have not had a permit all these years. And the operator of the plant says, latches, we've been prejudiced. And the learned district judge says, rather, it appears that Grand Canyon's delay worked to the benefit of Tucson Electric because it allowed Tucson Electric the opportunity to recover some or all of its investment before the suit was filed. That is to say, the longer this goes on, the more money your client makes doesn't sound like prejudice to me. So I think I need to know, or I think the district judge needs to know, as part of the record in front of it, as part of that prejudice analysis, what was the money your client was making? I think something else, though, that I've raised that was not discussed, no one's asked about. Where does BRI have standing to claim ownership of the exclusive ownership of the masters? BRI, under California Civil Code 980A2, the author or proprietor, and BRI was not the author or proprietor of anything, and there was no assignment of any ownership interest in the masters to BRI, and BRI has no standing to sue, number one. Number two, I had a case, I won't mention the judge's name, where I just tried a case about four months ago. Some people show up. They say, we were the performers on this 1963 recording, tried in the Senate district, and I asked the judge. I said, Your Honor, instruct us the statute of limitations as to ownership. He says, no, I'm not going to do that. 980, they can come at any time and do that. And I said, well, there has to be a statute of limitations to claim a personal property. He says, no. Well, fortunately, the jury came in and found they weren't the performers, so we're not up here on that appeal. But there has to be a statute of limitations as to a claim of personal property. You have under the Civil Code, you have under the Civil Code, this is no different than any other. There's property. There's personal and movable property. There's statute of limitations. Scalia. Any adverse possession here? No. We're claiming that we're claiming as what I thought, not adverse possession. We're claiming we were the owners as a matter of the proprietors as the commissioning parties. We exercised dominion and control over the property, just as Judge Kleinfeld in Zoll v. Shanahan, you know, the issue of ownership creation does not occur each well. I'm asking, that was my cross appeal, that the finding of we were not the owners, there's no basis for that. And there has to be, they cannot wait 38 years when everyone, the Morgans have passed away, when all the documentation is lost. And also, when you say there's evidentiary context in this latches business, when you come in in 2000 and say, oh, nothing happened during the 60s, nothing happened during the 70s. RCA, the record is complete with licenses throughout the ERA records, SEPTA I records, Capitol records, all these good goodies throughout the 60s and 70s, United Artists records. What are these things you're pointing to? These are things in Exhibit of the Record, Volume 5 of 15. These are recordings that were licensed by the Morgans in the 60s and 70s. And you could go out and buy these? Buy them, they were all over the place. They were all over the place. And the original sound of all these good goodies from 1969 was the number one selling compilation album in the country, and it was on that album from 1969 on. Are they still selling them? We've, they've, I think there's some very limited because of the dispute right now, holding off because of what your honors are going to do. So there's a whole, I mean, there's, you know, if someone comes and wants them, you know, there's a cloud on title, so you don't, if there's a cloud on the orange grove, you don't sell the oranges because maybe they are, maybe they aren't, because, you know, there's a cloud on title. Why is there not a statute of limitations on declaratory relief for ownership? How can somebody come back 40 years and say, we own that property who was not even have standing? I don't see where BRI has standing here. I don't see where they have standing. How do they ever have any possibility of claiming to be the exclusive ownership of those recordings of 61, 62? The corporation wasn't formed in 67. There's no assignment of the rights of ownership to them. And then they say, we're the exclusive owners, 980. Well, I'm the exclusive owners of this, I'm the exclusive owners of this, of this nice podium here. I just wanted to tell you that. Wait a second. The Ninth Circuit's had it for 30 years. I understand this argument. Thank you. Okay. You have less than a minute left. We'll give you a minute for a bottle. Oh, thank you very much. Not you, Mr. Hyman. Pardon? Not you, Mr. Hyman. Oh, I don't get a minute for your bottle. No, you don't get your bottle. You get to sit down. Oh, I get it. I thought I was going to get a minute for your bottle. You may get to talk again, but not on that subject. Oh, okay. Go ahead. Well, Donjock does say full knowledge. I recognize that Judge O'Scanlan's opinion talks about knew or should have known. I don't know that it's necessary in this case to actually resolve that issue, although I do see the issue. We had different clauses of action, and they had different elements. And so one of the things about the district court was there was no analysis of each of when the elements, each element has to be known. Each element must be known, and each element of each claim is quite different. There was no analysis of that. As far as publishing is concerned, and I'll just take one page. This is out of 1344 of the record, but it's on Guild Music. It says publishing royalties, and it says statement herewith pertains to writer Mike Love. So he's on notice that they're using his words, not his voice, not his likeness, not the trademark which is owned by BRI, the Beach Boys. This puts him on notice of nothing. And every one of the pages, every one of these reports are like this. And the checks, likewise, are like this. As far as standing is concerned, this Court has already established standing in its prior decision in the Jardine case. Thank you. Mr. Hyman, you do get to say something. You know, do you know what it means to have a quotation? A quotation? Yes. Yes. You know, the thing between the quotations is supposed to be the very thing that you're quoting? Dot, dot, dot, yes. No, no, the words. If you put quotations on something, that's a representation that you're quoting, that they're using the very words. Right, I know that. Well, you seem to know that, but your brief seems not to reflect that knowledge. If you step forward, I will give you a list of problems with your brief. You can give a copy to opposing counsel. And you can take a look at this. There's three of them. Do you want me to just take all three? You can keep an extra copy for yourself. These are things in your brief that seem to be misquotations. Oh, on the site of Box v. Jones? Yeah, you will go through them. And then you can send us a letter explaining if you think those things are in fact correct and somehow we misperceived the misquotations. If it turns out you are convinced that you did misquote, I know you would not want to have a brief on file here that has that problem, so I will grant you leave to file a revised brief using the correct quotations. And, of course, you will not charge your client for any of this work in correcting the brief or responding to our questions. So you've got a week, Mr. Hyman. You can either send us a letter telling us that you're right or you can send us a revised brief that cures these problems if they are in fact problems. And you will keep in mind that when you file a brief in this court or any other court, your statements of fact and quotations are statements of fact. It's very important they be accurate. Okay, Mr. Hyman? Thank you very much, Your Honor. You will take a look at this and communicate with us further one way or the other. Okay? Thank you, counsel. The case is argued. Mr. Hyman, submit it.
judges: Kozinski, O'scannlain, Fletcher